UNITED STATES DISTRICT
COURT FOR NORTHERN
DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) MDL 2804 |
| | ) |
| | ) Case No. 1:17-md-2804 |
| THIS DOCUMENT RELATES TO: | ) |
| | ) Judge Dan Aaron Polster |
| *Passamaquoddy Tribe–Pleasant Point v. Purdue Pharma et al.*, 1:19-op-45100-DAP | ) |
| | ) TRIBAL PLAINTIFFS' SHORT FORM |
| | ) FOR SUPPLEMENTING COMPLAINT |
| | ) AND AMENDING DEFENDANTS AND |
| | ) JURY DEMAND |

Plaintiff submits this supplemental pleading and Amended Complaint incorporating as if fully set forth herein its own prior pleadings and, if indicated below, the common factual allegations identified and the RICO causes of action included in *Muscogee (Creek) Nation's* First Amended Complaint, (Doc. 731, 1:17-md-02804) and *The Blackfeet Tribe of the Blackfeet Indian Reservation's* Corrected First Amended Complaint (Redacted), (Doc. 9, 18-op-45749), both as pleaded and as may be amended in the future ("Tribal Bellwether Plaintiffs' pleadings"), and any additional claims asserted herein. Plaintiff also hereby amends its complaint to alter the defendants against which claims are asserted as identified below. To the extent defendants were previously sued in plaintiff(s)' existing complaint and they are no longer identified as defendants herein, they have been dismissed without prejudice except as limited by CMO-1, Section 6(e). Doc. #: 232.

INCORPORATION BY REFERENCE OF EXISTING COMPLAINT

1.  Plaintiff's Existing Complaint (No. 1:19-op-45100-DAP, Doc. #: 1)[1] is expressly incorporated by reference to this Short Form as if fully set forth herein except to

---

[1] *Passamaquoddy Tribe–Pleasant Point v. Purdue Pharma et al.*, 1:19-op-45100-DAP, Doc. #: 1 (N.D. Ohio February 28, 2019).

the extent that allegations regarding certain defendants that are not listed in section 2 below are dismissed without prejudice.

## PARTIES — DEFENDANTS

2.      Having reviewed the relevant ARCOS data, Plaintiff asserts claims against the following Defendants:

A.      Defendants named in Plaintiff's Existing Complaint.[2]

1.  Purdue Pharma L.P.
2.  Cephalon, Inc.
3.  Teva Pharmaceuticals Industries Ltd.
4.  Teva Pharmaceuticals USA. Inc.
5.  Endo International PLC
6.  Endo Health Solutions, Inc.
7.  Endo Pharmaceuticals, Inc.
8.  Jansen Pharmaceuticals, Inc.
9.  Mallinckrodt PLC
10. Mallinckrodt LLC
11. Allergan PLC f/k/a Actavis PLC
12. Allergan Finance LLC f/k/a Actavis Inc. f/k/a Watson Pharmaceuticals, Inc.
13. Watson Laboratories, Inc.
14. Actavis LLC
15. Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.
16. AmerisourceBergen Drug Corporation
17. Cardinal Health, Inc.
18. McKesson Corporation
19. Omnicare Distribution Center LLC
20. Masters Pharmaceutical, Inc.
21. CVS Health Corporation
22. CVS Pharmacy, Inc.
23. Omnicare, Inc.
24. Walgreens Boots Alliance, Inc.
25. Walgreens Company
26. Rite Aid Corporation
27. Walmart, Inc.

B.      Defendants not named in Plaintiff's Existing Complaint but named in the Muscogee and/or Blackfeet Complaints.

---

[2] Claims were asserted against Insys Therapeutics, Inc. in the original complaint. However, on June 10, 2019, Insys Therapeutics, Inc. commenced a case under Chapter 11 of the U.S. Bankruptcy Code, 11 U.S.C. § 101 *et seq.* in the United States Bankruptcy Court for the District of Delaware, Case No. 19-11292 (KG), and an automatic stay is in effect. *See* In re National Prescription Opiate Litigation, 1:17-md-02804-DAP, Doc. #: 1670 (N.D. Ohio June 10, 2019). Consequently, no further claims are asserted against Insys Therapeutics, Inc. in this Short Form Complaint.

Plaintiff incorporates by reference all the allegations set forth in the Muscogee and Blackfeet complaints relating to and against each of the Defendants named below:

1. Purdue Pharma Inc.
2. The Purdue Frederick Company
3. Teva Pharmaceuticals Ltd.
4. Amneal Pharmaceuticals, Inc.
5. KVK-Tech, Inc.
6. Cardinal Health 110, LLC
7. AmerisourceBergen Corporation
8. Wal-Mart Stores, Inc.
9. Anda Pharmaceuticals, Inc.
10. Anda, Inc.
11. Omnicare Distribution Center LLC
12. Johnson & Johnson
13. Ortho-McNeil-Janssen n/k/a Janssen Pharmaceuticals, Inc.
14. Janssen Pharmaceutica Inc. n/k/a Janssen Pharmaceuticals, Inc.
15. Par Pharmaceutical, Inc.
16. Par Pharmaceutical Companies, Inc.
17. SpecGX LLC
18. Walmart Inc. f/k/a Wal-Mart Stores, Inc.
19. Walgreen Co.

C.   Defendants appearing in the ARCOS data but not named in Plaintiff's Existing Complaint or the Muscogee and Blackfeet Pleadings

Plaintiff names the following Defendants who appear in the ARCOS data but who were not previously named in either Plaintiffs' existing complaint or in the Blackfeet or Muscogee complaints:

Labelers/manufacturers

1. Mylan Pharmaceuticals, Inc.[3]
2. Sandoz, Inc.
3. West-Ward Pharmaceuticals Corp.[4]
4. Apotex Corp.
5. Sun Pharmaceutical Industries, Inc.
6. Alpharma Pharmaceuticals LLC[5]

---

[3] On information and belief, Mylan Pharmaceuticals, Inc. recently has been purchased by Pfizer Inc and has been combined with Upjohn, a Pfizer subsidiary, to be spun off into a new company.

[4] On information and belief, West-Ward Pharmaceuticals Corp. is a wholly owned subsidiary of Hikma Pharmaceuticals PLC and now operates as Hikma Pharmaceuticals USA Inc.

[5] On information and belief, Alpharma Pharmaceuticals LLC was purchased by King Pharmaceuticals in 2008. Then, in 2010, King Pharmaceuticals was acquired and became a wholly owned subsidiary of Pfizer.

7. Rhodes Pharmaceuticals[6]
8. Pfizer Laboratories Div. Pfizer Inc.[7]
9. Zydus Pharmaceuticals (USA) Inc.
10. Alvogen, Inc.

Distributors

1. Burlington Drug Company
2. Eckerd Corporation[8]
3. H. D. Smith
4. H. D. Smith Wholesale Drug Co.
5. Burlington Drug Company
6. Albertsons LLC
7. Associated Pharmacies Inc.
8. Advantage Logistics

D.      Claims asserted against the above-listed Defendants.

All the Causes of Action asserted in Plaintiff's Existing Complaint are incorporated by reference herein against the foregoing defendants. The first Cause of Action (Public Nuisance), second Cause of Action (Negligence), third Cause of Action (Unjust Enrichment), fourth Cause of Action (Fraud and Misrepresentation), and fifth Cause of Action (Civil Conspiracy) in Plaintiff's Existing Complaint are asserted against all of the identified defendants listed above.  In addition, the sixth Cause of Action (Violations of the Racketeer Influenced and Corrupt Organizations Act) in Plaintiff's Existing Complaint is asserted against the following defendants:

1. Purdue Pharma L.P., Purdue Pharma, Inc., Purdue Frederick Company, Inc. and Rhodes Pharmaceuticals L.P.
2. Cephalon, Inc., Teva Pharmaceutical Industries LTD., and Teva Pharmaceuticals USA, Inc.
3. Endo International PLC, Endo Pharmaceuticals Inc. and Endo Health Solutions, Inc.
4. Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc.
5. Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc., Janssen Pharmaceuticals, Inc., Johnson & Johnson and Noramco, Inc.

---

[6] On information and belief, Rhodes Pharmaceuticals is a privately held company owned by the Sackler family which owns Purdue Pharma L.P.

[7] On information and belief, Pfizer Inc. owns Mylan Pharmaceuticals, Inc. and Alpharma Pharmaceuticals, Inc.

[8] On information and belief, Eckerd Corporation was purchased by Rite Aid Corporation in 2007.

6. Mallinckrodt PLC, Mallinckrodt LLC, Mallinckrodt Pharmaceuticals and SpecGx LLC.
7. Allergan Finance LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc., Allergan PLC f/k/a Actavis PLC, Watson Pharmaceuticals, Inc. n/k/a Actavis, Inc., Watson Laboratories, Inc., Actavis LLC, Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.
8. AmerisourceBergen Corporation.
9. Cardinal Health, Inc.
10. McKesson Corporation.
11. Omnicare Distribution Center LLC.
12. Masters Pharmaceuticals, Inc.
13. Anda, Inc.
14. Richard S. Sackler
15. Jonathan D. Sackler
16. Mortimer D.A. Sackler
17. Kathe A. Sackler
18. Ilene Sackler Lefcourt
19. Beverly Sackler
20. Theresa Sackler
21. David A. Sackler
22. Trust for the Benefit of Members of the Raymond Sackler Family.

In addition, Plaintiff adopts the Blackfeet Tribe's First Claim for Relief (Violation of Racketeer Influenced and Corrupt Organizations Act) against the following defendants:

1. Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company, Inc.
2. Cephalon, Inc., Teva Pharmaceutical Industries, Ltd., and Teva Pharmaceuticals USA, Inc.
3. Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc., Johnson & Johnson and Janssen Pharmaceuticals, Inc.
4. Endo Health Solutions, Inc., Endo International PLC and Endo Pharmaceuticals Inc.
5. Mallinckrodt LLC, Mallinckrodt PLC, Mallinckrodt Pharmaceuticals and SpecGx LLC.

Plaintiff also hereby adopts the Blackfeet Tribe's Second Claim for Relief (Violation of Racketeer Influenced and Corrupt Organizations Act) against the following defendants:

1. Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company, Inc.
2. Cephalon, Inc., Teva Pharmaceutical Industries, Ltd., and Teva Pharmaceuticals USA, Inc.
3. Endo Health Solutions, Inc., Endo International PLC and Endo Pharmaceuticals Inc.
4. Mallinckrodt LLC, Mallinckrodt PLC, Mallinckrodt Pharmaceuticals and SpecGx LLC.

5. Allergan Finance LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc., Allergan PLC f/k/a Actavis PLC, Watson Pharmaceuticals, Inc. n/k/a Actavis, Inc., Watson Laboratories, Inc., Actavis LLC, Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.
6. AmerisourceBergen Corporation.
7. Cardinal Health, Inc.
8. McKesson Corporation.

**I, John M. Broaddus, Counsel for Plaintiff(s), certify that in identifying all Defendants, I have followed the procedure approved by the Court and reviewed the ARCOS data that I understand to be relevant to Plaintiff(s).**

**I further certify that, except as set forth below, each** of **the Defendant(s) newly added herein appears in the ARCOS data I reviewed.**

**I understand that for each newly added Defendant not appearing in the ARCOS data I must set forth below factual allegations sufficient to state a claim against any such newly named Defendant that does not appear in the ARCOS data.**

**The following newly added Defendant(s)** *do not appear* **in the** ARCOS **data I reviewed:**

1. Richard S. Sackler
2. Jonathan D. Sackler
3. Mortimer D.A. Sackler
4. Kathe A. Sackler
5. Ilene Sackler Lefcourt
6. Beverly Sackler
7. Theresa Sackler
8. David A. Sackler
9. Trust for the Benefit of Members of the Raymond Sackler Family.

Dated: August 12, 2019           ___*/s/John M. Broaddus*_____

                               Attorney for Plaintiff(s)

Factual Allegations Regarding Individual Defendants

2.1   See attachment A.

## COMMON FACTUAL ALLEGATIONS

3. By checking the boxes in this section, Plaintiff hereby incorporates by reference to this document the common factual allegations set forth in the *Tribal Bellwether Plaintiffs'* Pleadings as identified in the Court's Order implementing the Tribal Plaintiff Short Form procedure.

### *Muscogee (Creek) Nation's* First Amended Complaint, (Doc. 731, 1:17-md-02804):

☒ **Common Factual Allegations (¶¶96-98)**
☒ **Common Factual Allegations - Marketing Manufacturers (¶¶99-156)**
☒ **Common Factual Allegations - Generic Marketing Manufacturers (¶¶157- 1 61)**
☒ **Common Factual Allegations - Diversion Defendants (¶¶162-165)**
☒ **Common Factual Allegations - Diversion Defendants and Distributor Defendants (¶¶166-169, 200-211)**
☒ **Common Factual Allegations - Distributor Defendants (¶¶212-223, 230-236)**
☒ **Common Factual Allegations - Pharmacy Defendants (¶¶170-177, 237-262)**
☒ **Common Factual Allegations - Diversion Manufacturer Defendants (¶¶224-229)**
☒ **Common Factual Allegations - RICO Marketing Enterprise (¶¶295--328)**
☒ **Common Factual Allegations - RICO Supply Chain Enterprise (¶¶329-352)**

### *The Blackfeet Tribe of the Blackfeet Indian Reservation's* Corrected First Amended Complaint (Redacted), (Doc. 9, 18-op-45749):

☒ **Common Factual Allegations (¶¶99-143, 480-585, 636-650, 721-735)**
☒ **Common Factual Allegations - Marketing Defendants (¶¶144-468, 701-720, 736-763)**
☒ **Common Factual Allegations - Distributor Defendants (¶¶469-473)**
☒ **Common Factual Allegations - Supply Chain Defendants (¶¶474-479)**
☒ **Common Factual Allegations - National Retail Pharmacy Defendants (¶¶586-635)**
☒ **Common Factual Allegations - RICO Marketing Enterprise (¶¶764-798)**
☒ **Common Factual Allegations - RICO Supply Chain Enterprise (¶¶799-827)**

4. If additional claims are alleged below that were not pled in Plaintiff's Existing Complaint (other than the RICO claims asserted herein), the facts supporting those allegations must be pleaded here. Plaintiff(s) assert(s) the following additional facts to support the claim(s) identified in Paragraph 6 below (below or attached):

Pursuant to the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 213, Plaintiffs have given 30 days' notice of their demand for relief to the following Defendants:

1. AmerisourceBergen Drug Corporation
2. Actavis LLC
3. Actavis Pharma, Inc.
4. f/k/a/ Watson Pharma, Inc.
5. Allergan plc
6. Allergan Finance LLC
7. Cardinal Health, Inc.
8. Cardinal Health 110, LLC
9. Cephalon, Inc.
10. Teva Pharmaceuticals USA Inc.
11. Teva Pharmaceuticals Industries Ltd.
12. Endo Health Solutions Inc.
13. Endo Pharmaceuticals Inc.
14. Endo International PLC
16. Janssen Pharmaceutica, Inc.
    n/k/a Janssen Pharmaceuticals, Inc.
17. Janssen Pharmaceuticals, Inc.
18. Johnson & Johnson
19. Mallinckrodt Enterprises LLC
20. Mallinckrodt LLC
21. Mallinckrodt PLC
22. McKesson Corporation
23. Ortho-McNeil-Jansen Pharmaceuticals, Inc.
    n/k/a Janssen Pharmaceuticals, Inc.
24. The Purdue Frederick Company
25. Purdue Pharma Inc.
26. Purdue Pharma L.P.
27. Watson Laboratories, Inc.
28. Masters Pharmaceutical, LLC
    f/k/a Masters Pharmaceutical, Inc.
28. Omnicare Distribution Center LLC

## CLAIMS

5. The following federal **RICO causes of action** asserted in the *Tribal Bellwether Plaintiffs'* Pleadings as identified in the Court's implementing order and any subsequent amendments, are incorporated in this Short Form by reference, in addition to the causes of action already asserted in the Plaintiff(s)'s Existing Complaint (check all that apply):

8

☒First Claim for Relief — Violation of RICO, 18 U.S.C. § 1961 *et seq.* — Opioid Marketing Enterprise (Against the "Marketing Manufacturer Defendants") (*Muscogee (Creek)* Pleadings, Paragraphs 353-379)

☒First Claim for Relief — Violation of RICO, 18 U.S.C. § 1961 *et seq.* — Opioid Marketing Enterprise (Against Defendants Purdue, Cephalon, Janssen, Endo and Mallinckrodt (the "RICO Marketing Defendants")) (*Blackfeet* Pleadings, Paragraphs 828-855)

☒Second Claim for Relief — Violation of RICO, 18 U.S.C. § 1961 *et seq.* — Opioid Supply Chain Enterprise (Against All Defendants) (*Muscogee (Creek)* Pleadings, Paragraphs 380-408)

☒Second Claim for Relief — Violation of RICO, 18 U.S.C. § 1961 *et seq.* — Opioid Supply Chain Enterprise (Against Defendants Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (the "RICO Supply Chain Defendants")) (*Blackfeet* Pleadings, Paragraphs 856-887)

6.      Plaintiff asserts the following additional claims as indicated (below or attached). Pursuant to the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 213, Plaintiffs have given the required 30 days' notice of their demand for relief to the Defendants listed in Paragraph 4 above.

7.      To the extent Plaintiff(s) wish(es) to **dismiss claims** previously asserted in Plaintiff(s)'s Existing Complaint, they are identified below and will be dismissed without prejudice.

_____
_____
_____
_____

WHEREFORE, Plaintiff(s) prays for relief as set forth in the *Tribal Bellwether* Pleadings in *In Re National Prescription Opiate Litigation* in the United States District Court for the Northern District of Ohio, MDL No. 2804 and in Plaintiff's Existing Complaint as has been amended herein.

Dated: August 12, 2019                    */s/John M. Broaddus*_____
                                          Attorney for Plaintiff(s)

# Attachment A

# I.     THE IDENTIFICATION OF NEWLY NAMED DEFENDANTS

## A.     Defendants Not Named in Plaintiff's Existing Complaint but Named in the Blackfeet and/or Muscogee Pleadings

The following defendants are not named in Plaintiff's Existing Complaint but are named

in the Blackfeet and/or Muscogee complaints.  Plaintiff incorporates by reference all the

allegations set forth in the Blackfeet and/or Muscogee complaints relating to and against

each of the defendants named below:

1. Purdue Pharma Inc.
2. The Purdue Frederick Company
3. Teva Pharmaceuticals Ltd.
4. Amneal Pharmaceuticals, Inc.
5. KVK-Tech, Inc.
6. Cardinal Health 110, LLC
7. AmerisourceBergen Corporation
8. Wal-Mart Stores, Inc.
9. Anda Pharmaceuticals, Inc.
10. Anda, Inc.
11. Omnicare Distribution Center LLC
12. Johnson & Johnson
13. Ortho-McNeil-Janssen n/k/a Janssen Pharmaceuticals, Inc.
14. Janssen Pharmaceutica Inc. n/k/a Janssen Pharmaceuticals, Inc.
15. Par Pharmaceutical, Inc.
16. Par Pharmaceutical Companies, Inc.
17. SpecGX LLC
18. Walmart Inc. f/k/a Wal-Mart Stores, Inc.
19. Walgreen Co.

## B.     Defendants Appearing in the ARCOS data but Not Named in Plaintiff's Existing Complaint or in the Blackfeet or Muscogee Complaints.

The following defendants appear in the ARCOS data but are not named in Plaintiff's

Existing Complaint or in the Blackfeet and/or Muscogee complaints.  The principal

place of business of each of the following defendants is in a State other than Maine.

Each of the following defendants is registered and/or licensed to do business in the State

of Maine and manufactures, promotes, distributes and/or sells opioids in the State of

Maine. Plaintiff incorporates by reference herein all the allegations and Causes of Action

1

set forth in the in Plaintiff's Existing Complaint relating to and against each of the

following defendants:

1. Mylan Pharmaceuticals, Inc.[1]
2. Sandoz, Inc.
3. West-Ward Pharmaceuticals Corp.[2]
4. Apotex Corp.
5. Sun Pharmaceutical Industries, Inc.[3]
6. Alpharma Pharmaceuticals LLC[4]
7. Rhodes Pharmaceuticals[5]
8. Pfizer Laboratories Div. Pfizer Inc.[6]
9. Zydus Pharmaceuticals (USA) Inc.
10. Alvogen, Inc.
11. Burlington Drug Company
12. Eckerd Corporation[7]
13. H. D. Smith
14. H. D. Smith Wholesale Drug Co.
15. Burlington Drug Company
16. Albertsons LLC
17. Associated Pharmacies Inc.
18. Advantage Logistics

**C.**   **Defendants Not Named in Either Plaintiff's Existing Complaint, the Blackfeet or Muscogee Pleadings, or the ARCOS data.**

---

[1] On information and belief, Mylan Pharmaceuticals, Inc. recently has been purchased by Pfizer Inc and has been combined with Upjohn, a Pfizer subsidiary, to be spun off into a new company. Defendant Mylan N.V. f/k/a Mylan Inc. is a global pharmaceutical company incorporated in the Netherlands that maintains its headquarters in Canonsburg, Pennsylvania. Defendant Mylan Pharmaceuticals Inc. (together with Mylan N.V. Mylan") is based in Canonsburg, Pennsylvania and operates as a subsidiary of Mylan N.V.  Mylan manufactures, markets, and sells prescription opioids throughout the United States, including in and around Washington County, Maine. Mylan is licensed in Maine.

[2] On information and belief, West-Ward Pharmaceuticals Corp. is a wholly owned subsidiary of Hikma Pharmaceuticals PLC and now operates as Hikma Pharmaceuticals USA Inc.

[3] Sun Pharmaceutical Industries, Inc. is a Delaware limited partnership with headquarters located at 2 Independence Way, Princeton, NJ 08540. Defendant is registered and licensed in Maine.

[4] On information and belief, Alpharma Pharmaceuticals LLC was purchased by King Pharmaceuticals in 2008. Then, in 2010, King Pharmaceuticals was acquired and became a wholly owned subsidiary of Pfizer.

[5] On information and belief, Rhodes Pharmaceuticals is a privately held company owned by the Sackler family which owns Purdue Pharma L.P. Defendant Rhodes Pharmaceuticals L.P. ("Rhodes") is a Delaware limited partnership formed in or around 2007 with headquarters located in Coventry, Rhode Island. Rhodes Pharmaceuticals L.P. was licensed in Maine in 2009.

[6] On information and belief, Pfizer Inc. owns Mylan Pharmaceuticals, Inc. and Alpharma Pharmaceuticals, Inc.

[7] On information and belief, Eckerd Corporation was purchased by Rite Aid Corporation in 2007.

The following defendants, named pursuant to ¶2.1 of the Short Form for Supplementing Complaint and Amending Defendants and Jury Demand, do not appear in Plaintiff's Existing Complaint, the Blackfeet or Muscogee complaints, or the ARCOS data.[8]

1.  Defendant Richard S. Sackler is a natural person residing in Travis County, Texas. He has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990's.

2.  Defendant Jonathan D. Sackler is a natural person residing in Fairfield County, Connecticut.  He has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990's.

3.  Defendant Mortimer D.A. Sackler is a natural person residing in New York County, New York.  He has served as a member of the Board of Directors of Purdue and Purdue- related entities since the 1990's.

4.  Defendant Kathe A. Sackler is a natural person residing in Fairfield County, Connecticut.  She has served as a member of the Board of Directors of Purdue and Purdue- related entities since the 1990's.

5.  Defendant Ilene Sackler Lefcourt is a natural person residing in New York County, New York.  She has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990's.

6.  Defendant Beverly Sackler is a natural person residing in Fairfield County, Connecticut.  She has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990's.

---

[8] On information and belief, the following are the owners of the privately held Purdue Pharma entities, including Purdue Pharma L.P., Purdue Pharma Inc., and Rhodes Pharmaceuticals.

7. Defendant Theresa Sackler is a natural person residing in New York County, New York. She has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990's.

8. Defendant David A. Sackler is a natural person residing in New York County, New York. He has served as a member of the Board of Directors of Purdue and Purdue-related entities since 2012.

9. Defendant Trust for the Benefit of Members of the Raymond Sackler Family (the "Raymond Sackler Trust") is a trust for which Defendants Beverly Sackler, Richard S. Sackler and/or Jonathan D. Sackler are trustees. It is the 50% direct or indirect beneficial owner of Purdue and the Purdue-related entities and the recipient of 50% of the profits from the sale of opioids by Purdue and Purdue-related entities. Collectively, the defendants listed in ¶¶2-10 are referred to as the "Sackler Defendants" or "Sackler Families."

## II. JURISDICTION

1. This Court has subject matter jurisdiction over this action in accordance with 28 U.S.C. § 1407 by virtue of the transfer of these matters to this jurisdiction by the Judicial Panel for Multidistrict Litigation and the diversity jurisdiction of the United States District Court for the District of Maine pursuant to 28 U.S.C. § 1332(a).[9] Complete diversity exists between Plaintiff (a Sovereign Nation and citizen of the State of Maine) and Defendants (citizens of states other than Maine). The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

---

[9] *See* In re: National Prescription Opiate Litigation, 1:17-md-02804-DAP, Doc. #: 1, *Transfer Order* (N.D. Ohio Dec. 12, 2017). This Short Form Complaint is filed directly in this Court pursuant to the Court's Case Management Order One. *See* In re: National Prescription Opiate Litigation, 1:17-md-02804-DAP, Doc. #: 232, Case Management Order One (N.D. Ohio April 11, 2018).

2.    This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 based upon the federal claims asserted under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO Act").  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as the state law claims are so related to Plaintiff's federal law claims that the claims form part of the same case or controversy.

3.    The District of Maine is a judicial district where the above-named defendants are subject to personal jurisdiction in accordance with 28 U.S.C. §1331 and Maine Revised Statutes § 704-A, the Maine long-arm statute.  Each of the defendants identified in Section I above purposefully availed themselves of the benefits, profits and privileges deriving from their business activities in the State of Maine.

4.    Each of the above-listed defendants also regularly engages in business within the State of Maine and is registered and licensed to do business in the State of Maine.  Each defendant has committed tortious acts that have caused injury to the Plaintiff.  Each defendant expects, or should reasonably have expected, those acts to have consequences in the State of Maine and Plaintiff's sovereign lands. Moreover, each defendant solicited business within this District, engaged in persistent courses of conduct here and derived substantial revenue from goods used and services rendered in the State of Maine and the Tribe's reservation lands through interstate commerce.

5.    Each defendant is regularly engaged in the business of manufacturing and distributing prescription opioids, either directly or indirectly through third-party related entities, in the State of Maine and upon the Tribe's reservation lands.  Each defendant's activities in the State of Maine and upon the Tribe's reservation lands in connection with the

manufacture and distribution of prescription opioids were, and are, continuous and systematic and give rise to the causes of action alleged herein.

6.  At all relevant times, each defendant expected or should have expected that their acts would have consequences within the United States of America and, specifically, the State of Maine and upon the Tribe's reservation lands.

7.  Each defendant herein and its subsidiaries and related corporate entities were, and are, the agents, representatives, joint venturers, alter egos, co-conspirators, consultants, predecessors, successors, servants, and/or employees of each other.

8.  In doing the acts alleged herein, each defendant herein and its subsidiaries and related corporate entities were, and are, acting in the course and scope of such agency, representation, joint venture, conspiracy, consultancy, predecessor agreement, successor agreement, service and employment, with knowledge, acquiescence and ratification of each other.

9.  As a result of this imputed activity in the States of Ohio and Maine, it is reasonable for each defendant herein and its subsidiaries and related corporate entities to anticipate being subject to litigation in Ohio and Maine, and for this Court to exercise personal jurisdiction over it as comporting with fair play and substantial justice.

## III.  FACTUAL ALLEGATIONS CONCERNING THE NEWLY ADDED DEFENDANTS THAT DO NOT APPEAR IN THE ARCOS DATA

### A.  The Individual Sackler Defendants Direct and Control Purdue

10.  Richard Sackler is one of the six inventors listed on the original patent for OxyContin. He began working for Purdue in the 1970's as an assistant to his father, Raymond Sackler, who served as the president of the company at that time. Richard rose through leadership in the subsequent decades, serving as President of Purdue from 1999 to 2003.

11.    Richard Sackler resigned from his role in 2003 over apparent worry that executive officers of Purdue would be held personally liable for any opioid-related liabilities. He continued to serve as co-chair of Purdue's board with his uncle, Mortimer Sackler. This allowed the Sackler Defendants to retain control of the company regardless of their involvement at the executive level.

12.    During his executive tenure at Purdue, Richard Sackler actively participated in nearly every aspect of the company's opioid products, from invention to marketing to sale. With the assistance of his father, Raymond, and his uncle, Mortimer, Richard introduced OxyContin to the market with one of the largest pharmaceutical advertising campaigns in history.  Within five years, OxyContin was earning Purdue $1 billion a year.

13.    At all relevant times, Richard Sackler served as trustee of one or more trusts that own and control Purdue or Purdue-associated companies.  He is the direct or indirect beneficiary of some portion of 25% of the profits earned from the sale of opioids by Purdue and the Purdue-associated companies listed herein.

14.    Jonathan Sackler served as Senior Vice President of Purdue by 2000.  Like Richard, his brother, Jonathan resigned from his position in or after 2003, due to concerns that the executive officers of Purdue would be personally liable for crimes and litigation stemming from Purdue's opioid products.  Jonathan continued to serve on Purdue's board after his resignation.

15.    At all relevant times, Jonathan Sackler served as trustee of one or more trusts that own and control Purdue or Purdue-associated companies.  He is the direct or indirect beneficiary of some portion of 25% of the profits earned from the sale of opioids by Purdue and the Purdue- associated companies listed herein.

16.     Mortimer Sackler is the direct or indirect beneficiary of 7.14% of the profits earned from the sale of opioids by Purdue and the Purdue-associated companies listed herein Kathe Sackler began serving as Senior Vice President of Purdue by 2000.  She resigned from her position in or about 2003 due to concerns that the executive officers of Purdue could be held personally liable for crimes and litigation stemming from Purdue's opioid products.  She continued to serve on Purdue's board.  She is the direct or indirect beneficiary of 7.14% of the profits earned from the sale of opioids by Purdue and the Purdue-associated companies listed herein.

17.     Ilene Sackler Lefcourt served as Vice President of Purdue during the initial development and launch of OxyContin.  She, too, resigned from her position around 2003 due to concerns of personal liability for executive officers of Purdue for opioid-related crimes and litigation but continued to serve on the board.

18.     Beverly Sackler has served on the Board of Directors of Purdue and associated entities since the 1990's.  She serves as the trustee of one or more trusts that own or control Purdue and Purdue-associated companies, and to which 50% of the profits of the companies' sale of opioids have been conveyed.  She is the direct or indirect beneficiary of some portion of 50% of the profits earned by Purdue through the sale of opioids.

19.     Theresa Sackler has served on the Board of Directors of Purdue and associated entities since the 1990's.  She is the direct or indirect beneficiary of some portion of 50% of the profits earned by Purdue through the sale of opioids.

20.     David Sackler has served on the Board of Directors of Purdue and associated entities since 2012.  He is the direct or indirect beneficiary of some portion of 25% of the profits earned by Purdue through the sale of opioids.

21.     Richard Sackler, Jonathan Sackler, Mortimer Sackler, Kathe Sackler, Ilene Sackler
        Lefcourt, Beverly Sackler, Theresa Sackler, David Sackler and the Raymond Sackler
        Trust (through its trustees) each knowingly aided, participated in and benefited
        from the unlawful conduct of Purdue.

**B.     The Sackler Defendants Oversee and Direct Purdue's Unlawful Conduct**

22.     Prior to Purdue's entry into the opioid market, the general standard use of opioids was
        for short-term periods, for example: acute pain, surgery recovery, cancer and palliative
        care.  Chances of opioid abuse are low when applied in this manner.  Purdue went to
        great effort to influence public perception of the perceived benefits and risks of long-
        term opioid use.

23.     Arthur Sackler, the brother of Raymond and Mortimer Sackler, is largely
        responsible for this change in public perception, effectively creating the pharmaceutical
        advertising industry.  He realized that direct advertising to doctors and prescribers would
        be the most effective means of turning a profit.  He paid prominent doctors to endorse
        his products, offered physicians perks and benefits, published marketing material
        disguised as neutral medical journal articles and funded "education" seminars that
        extolled the virtues of his drug products.  His deceptive and unethical marketing
        techniques led to Valium becoming the first hundred- million-dollar, then billion-dollar,
        prescription drug and set the precedent for the current problems with
        pharmaceutical marketing.

24.     The Sackler Defendants have continued to direct Purdue's unlawful marketing
        techniques, using many of the same unethical techniques developed by Arthur Sackler, in
        order to maximize their sales of opioid products.

25. OxyContin was launched with one of the largest pharmaceutical marketing campaigns in history, with roughly 1,000 sales representatives touting the drug's benefits. Representatives would recommend OxyContin as the solution not just for acute, short-term pain but also for less-acute, longer-lasting pain. Sales training included lessons in overcoming doctors' concerns about health and addiction by minimizing or downplaying OxyContin's true qualities. Purdue paid thousands of physicians to present to medical conferences on the benefits of OxyContin.

26. Upon information and belief, members of the Sackler Families were deeply involved in OxyContin's marketing campaign. Family members were on site at Purdue's headquarters daily, controlling the management of the family business. According to a former sales representative, Richard Sackler was "the dude that made it happen." In response to the concerns of benefit plans that OxyContin was ripe for addictive use, Richard sent an e-mail to sales representatives, asserting that "'addiction' may be a convenient way to just say 'NO.'"

27. According to e-mails obtained by the Massachusetts Attorney General ("AG"), the Sacklers considered whether they could sell OxyContin as "non-narcotic," without the safeguards that protect patients from addictive drugs, which would result in a "vast increase of the market potential." The inventor of OxyContin, Robert Kaiko ("Kaiko"), wrote to Richard Sackler that he was "very concerned" about the danger of selling OxyContin without strict controls. Kaiko warned: "I don't believe we have a sufficiently strong case to argue that OxyContin has minimal or no abuse liability." To the contrary, Kaiko wrote, "oxycodone containing products are still among the most abused opioids in the U.S." Kaiko predicted: "If OxyContin is uncontrolled, . . . it is highly likely that it

will eventually be abused."   Richard Sackler responded: "How substantially would it improve your sales?"

28.     In 1997, Richard and Kathe Sackler took part in a conspiracy to mislead doctors by claiming oxycodone was half as strong as morphine when the opposite was the case. Purdue engaged in this deception to alleviate the fears of medical professionals in prescribing the drug for non-acute pain.  As recorded in internal correspondence obtained by the Massachusetts AG, Richard Sackler directed Purdue staff not to tell doctors the truth because the truth could reduce OxyContin sales.

29.     Around 1999 to 2003, Purdue had a system whereby company e-mails would self- erase after pre-determined times.  This policy created a system whereby potentially incriminating documents would be automatically erased even if received by third parties. Richard, Jonathan and Kathe Sackler were all aware and supportive of this system.

## C.     The Sackler Families Were Aware of the Abuse Potential of OxyContin from No Later than Summer 1999

30.     Purdue and members of the Sackler Families were aware that OxyContin and other prescription medication could lead to addiction since at least summer 1999.  An internal memorandum prepared by Purdue employee Maureen Sara described the abuse and recreational use of OxyContin.  The memorandum was sent directly to Purdue's board members, including Richard, Jonathan and Kathe Sackler.

31.     In spite of the 1999 memorandum, Purdue President Michael Friedman testified before the U.S. House of Representatives in 2001 that Purdue had not become aware of OxyContin's potential for abuse until 2000.  No members of the Sackler Families attempted to correct this false narrative.

32.     The Sackler Defendants were thus aware of potential liability for Purdue since at least 1999 due to OxyContin's addictive nature.  Instead of attempting to fix or solve the issue

11

they had created, the Sackler Defendants began to transfer profits from Purdue and associated companies to their own private trusts and accounts in order to shield their funds from creditors.  In 2015, for example, the Sackler Families removed $700 million from their privately held companies, two-thirds of which came from Purdue.  These transfers of ill-gotten gains were and are fraudulent, unjustly enriched the Sackler Defendants and were done for the purpose of protecting the money from any civil or criminal judgment against Purdue for its participation in the opioid crisis.  These transfers also left Purdue and its associated entities undercapitalized and potentially unable to pay a judgment against them in this litigation.

33.  Rather than protect the public's health once they became aware of OxyContin's potential for abuse, the Sackler Families protected their own wealth.

**D.  The Sackler Families Are "Covered Persons" Under a Corporate Integrity Agreement with the U.S. Government and Established Rhodes as a "Landing Pad" in Case They Needed to Depart Purdue**

34.  The liability of the Sackler Defendants extends beyond their mere leadership of Purdue. They were aware of, and obligated to address, Purdue's conduct due to previous investigations into the company's deceptive practices.

35.  Purdue Pharma Inc. and Purdue Pharma L.P. were under investigation by 26 states and the U.S. Department of Justice ("DOJ") from 2001 to 2007.  In 2003, on the advice of legal counsel, every Sackler who held an executive role at Purdue resigned to avoid personal liability for the conduct in which they had engaged and continued to engage prior to and after their resignations.

36.  In 2007, the directors of Purdue Pharma Inc. declared that it would pay roughly $700 million and plead guilty to a felony for misleading doctors and patients about opioid medications.  (The company that paid the money, The Purdue Frederick Company Inc.,

was a separate corporate entity that was controlled by the same people and shared the same headquarters as Purdue Pharma L.P.)  The company acknowledged that its supervisors and employees had fraudulently promoted OxyContin as safer and less addictive than other pain medications.

37.     Michael Friedman, the Chief Executive Officer ("CEO") of Purdue, pled guilty to criminal charges of fraudulent marketing.  Howeard Udell, Purdue's chief lawyer, and Paul Goldenheim, Purdue's chief medical officer, pled guilty to the same crime.  The directors, including members of the Sackler Families, were forced to choose a new CEO; and the felony convictions resulted in mass-scale retraining of company employees.

38.     The 2007 convictions warned the directors against any further deception.

39.     The directors also agreed to a Consent Judgment that ordered Purdue not to make any false or misleading oral or written claims about OxyContin, including concerning the risk of addiction.  The Consent Judgment also required Purdue to establish a program that would identify high-prescribing doctors, stop promoting OxyContin to them and report them.  This program was to last from 2007 to 2017.

40.     The directors also entered a Corporate Integrity Agreement with the U.S. government, wherein Purdue would appoint a compliance officer to a senior management position at Purdue.  The officer would make periodic reports on compliance matters to the board to ensure no deception took place again.  Under the agreement, the directors and CEO were "Covered Persons" who had to comply with rules prohibiting deception regarding Purdue's products.  This status lasted from 2007 to 2012 and required that leadership report all rule violations and undergo hours of compliance training.  The directors and CEO were warned of consequences in case of a violation and certified that they understood their new status.

13

41.     In or around November 2007, in the immediate aftermath of the guilty plea by Purdue and its executives regarding the company's false and misleading marketing of OxyContin, the Sackler Defendants established Rhodes Pharmaceuticals L.P. ("Rhodes"). According to a former senior manager at Purdue, "Rhodes was set up as a 'landing pad' for the Sackler family in 2007, to prepare for the possibility that they would need to start afresh following the crisis then engulfing OxyContin."

42.     The Sacklers' involvement in Rhodes and its relationship to Purdue was not publicly known until the September 9, 2018 publication of an article in the Financial Times. According to the article, "Rhodes has not been publicly connected to the Sackler family before, and their ownership of the company may weaken one of their longstanding defences: that they cannot be held responsible for the opioid crisis because Purdue accounts for a small fraction of the overall prescriptions."

43.     Despite being registered as a separate company from Purdue, staff from Rhodes and Purdue use the same employee handbook and "little distinction is made internally between the two companies."

44.     Rhodes manufactures, markets, sells and distributes opioids in the State of Maine and nationwide.[10]

45.     According to the Financial Times, in 2016, Rhodes had a substantially larger share of prescriptions in the U.S. prescription opioid market than Purdue.

**E.      Even After DOJ Intervention, the Sackler Families Continued to Oversee Purdue's Wrongdoing**

---

[10] *See e.g.* State of Maine v. Purdue Pharma et al., *Complaint for Injunctive Relief and Civil Penalties under the Maine Unfair Trade Practices Act* (Kennebec County Superior Court)(describing defendant's misconduct and unlawful business practices in the State of Maine regarding its opioid products and seeking injunctive relief and civil penalties).

46.     Regardless, even after establishing Rhodes as a "landing pad," being subjected to

hundreds of millions of dollars in fines, and agreeing to a Corporate Integrity

Agreement, the Sackler Families continued to oversee Purdue's wrongdoing.

47.     Purdue's directors were clearly aware of their obligations under the above agreements.

In 2009, Purdue had to report to the Inspector General of the U.S. Department of

Health and Human Services ("HHS") that it had not immediately trained a new director

on the terms of the Corporate Integrity Agreement.   Purdue assured the government

that the director had undergone the training the day after Corporate Compliance had

learned of the issue.

48.     The years after the 2007 guilty plea and Corporate Integrity Agreement were filled with

alarming reports and stories about the opioid crisis.  However, in spite of these

widespread  warnings,  Purdue's  directors,  including  members  of  the  Sackler

Families,  did nothing to stop Purdue's misconduct.  Instead, they continued to concern

themselves with how to protect their wealth.

49.     According  to  documents  obtained  by  the  Massachusetts  AG,  in  April  2008,

Richard Sackler sent Kathe, Ilene, David, Jonathan and Mortimer Sackler a secret

memorandum about how to keep money flowing to their family.   Richard wrote that it

was crucial to install a CEO who would be loyal to the family: "People who will shift

their loyalties rapidly under stress and temptation can become a liability from the

owners' viewpoint."  Richard Sackler recommended John Stewart ("Stewart") for CEO

because of his loyalty.  He also proposed that the family should either sell Purdue in

2008 or, if they could not find a buyer, milk the profits out of the business and

"distribute more free cash flow" to themselves.

50.     That month, the Sacklers voted to have Purdue pay their family $50,000,000.

15

51.     From the 2007 convictions until 2018, the Sacklers reportedly voted dozens of times to pay out Purdue's opioid profits to their family – in total more than four billion dollars.

52.     In 2008, opioid overdoses killed more Americans in that year than any year prior.

53.     In 2009, the American Journal of Public Health published "The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy."  The article detailed the misleading and deceptive nature of Purdue's opioid marketing, including the misuse of sales representatives, the targeting of high-prescribing practitioners and deception about the potential rates of abuse.  The CDC reported that deaths stemming from opioid use had tripled in the preceding year.

54.     In 2010, Time magazine published "The New Drug Crisis: Addiction by Prescription." The article focused extensively on Purdue's line of opioid products.  Overdoses were the number one cause of accidental death in 15 states that year, and Purdue's directors were informed that Purdue would not be able to get product liability insurance to cover OxyContin.

55.     In 2011, the White House announced that prescription drug abuse was the nation's fastest-growing drug problem and called for educating healthcare providers about prescription drug abuse to prevent overprescription.  The Centers for Disease Control and Prevention ("CDC") announced that prescription opioid overdoses had reached never-before- seen levels and specifically called out Purdue's line of opioid products.  Fortune magazine published an article that same year where Purdue executives were interviewed about the ongoing crisis and the involvement of the company and the Sackler Families.  The interviewees included Purdue Vice President Alan Must, who admitted that Purdue was "well aware" of concerns about its conduct: "We are well

aware of detractors.  For those individuals who think we're evil … I don't think there's anything we can do that is going to change their opinion."

56.　In 2012, the U.S.  Senate announced an investigation into Purdue's unlawful deception of doctors and patients about the nature of its opioid products.  The Senators warned of "an epidemic of accidental deaths and addiction resulting from the increased sale and use of powerful narcotic painkillers" in a letter to the CEO of Purdue Pharma, Inc. and Purdue Pharma L.P.  The Senate letter specifically warned of the danger of higher levels of opioid dosage: "over the last decade, the number of prescriptions for the strongest opioids has increased nearly fourfold, with only limited evidence of their long-term effectiveness or risks while data suggest that hundreds of thousands of patients nationwide may be on potentially dangerous doses."

57.　The Senate letter also warned about Purdue's deceptive tactics with doctors and patients: "There is growing evidence pharmaceutical companies that manufacture and market opioids may be responsible, at least in part, for this epidemic by promoting misleading information about the drugs' safety and effectiveness."  The Senate specifically warned the directors and CEO that they were under scrutiny, demanding that Purdue present a set of "presentations, reports, and communications to Purdue's management team or board of directors from 2007 to the present."

58.　In 2013, the Los Angeles Times reported that Purdue had created a list of 1,800 doctors suspected of recklessly prescribing its opioids over the past decade but had reported only 8% of them to authorities.  Purdue attorney Robin Abrams ("Abrams") gave multiple interviews to the newspaper.  Abrams was a Vice President of Purdue, and she signed Purdue's 2007 settlement agreement.  In 2013, she admitted that Purdue had the list and said with regard to Purdue's unwillingness to disclose the list: "I don't really want to

17

open up an opportunity for folks [to] come in here and start looking and second-guessing."

59.  Abrams and Purdue's directors had good reason to be concerned: the state of Kentucky had brought a lawsuit against Purdue for deceiving doctors and patients about the nature of its opioid products.  When Purdue's lawyers surveyed the local residents for potential jury service, one-third of respondents said they knew someone who had been hurt or had overdosed taking Purdue opioids, and 29% knew someone who had died.  Purdue itself filed these findings in court.

60.  In 2014, Edward Mahony, the Executive Vice President, Chief Financial Officer and Treasurer of Purdue, announced that the Kentucky lawsuit was noteworthy enough to "jeopardize Purdue's long-term viability."  The Governor of Massachusetts declared the opioid crisis a public health emergency in the same year.

61.  In 2016, in an attempt to stop the threatening spread of opioid overprescribing, the CDC published the CDC Guideline for Prescribing Opioids for Chronic Pain.

62.  In 2017, the President of the United States announced that opioid use in the nation had risen to the level of a national public health emergency.

63.  Plaintiff is informed and believes, and thereupon alleges, that the directors and CEO controlled the operation of Purdue's sales representatives.  Director Richard Sackler testified that Purdue primarily promoted its opioids through its sales representatives and that regular visits from representatives were the key to get doctors to continue to prescribe the drugs.  The board knew which drugs the sales representatives were to promote, the number of visits representatives made to doctors, how much each visit cost the company and the quarterly plans for sales visits.  The board approved specific hiring

plans for their sales representatives, hiring directors and regional managers and creating sales territories for representatives to target doctors.

64. Documents obtained by the Massachusetts AG detailed Richard Sackler's intense day-to-day involvement.  For example, in January 2010, Richard Sackler asked sales staff for new customized reports.   Staff complained to each other until Sales Vice President Russell Gasdia ("Gasdia") asked Stewart to intervene: "Can you help with this?  It seems like every week we get one off requests from Dr. Richard."  But neither Stewart nor anyone else could keep Richard out of sales.  Days later, Richard was writing to a sales employee on a Saturday morning, ordering that his need to review the sales plan was "urgent" and should be satisfied "this weekend."

65. Plaintiff is informed and believes, and thereupon alleges, that the directors and CEO oversaw the specific tactics used by sales representatives to sell opioids; for example, a board report encouraged the use of iPads during sales visits, which increased the average length of meetings to 16.7 minutes.

66. According to documents obtained by the Massachusetts AG, at a 2011 Launch Meeting for Butrans, an opioid introduced by Purdue that releases opioids into the body via skin patch, Richard Sackler met with sales representatives for several days to discuss how they would promote the new product.   Richard Sackler followed up with sales management to demand a briefing on how the sales visits were going in the field: "I'd like a briefing on the field experience and intelligence regarding Butrans.  How are we doing, are we encountering the resistance that we expected and how well are we overcoming it, and are the responses similar to, better, or worse than when we marketed OxyContin tablets?"

67. Plaintiff is informed and believes, and thereupon alleges, that the directors and CEO oversaw the promotional claims representatives used during sales visits.  The directors

and CEO reviewed reports that Purdue sales representatives were deceptively promoting opioids as an appropriate treatment for minor pain, among hundreds of other examples of unlawful marketing techniques in need of correction.

68. According to documents obtained by the Massachusetts AG, Richard Sackler demanded that he be sent into the field with sales representatives. Richard wanted a week shadowing Purdue sales representatives, two representatives per day. Gasdia reportedly appealed to Purdue's Chief Compliance Officer in horror, warning that Richard Sackler promoting opioids was "a potential compliance risk." Compliance replied: "LOL." To make sure the Sacklers' involvement in marketing stayed secret, staff instructed: "Richard needs to be mum and anonymous."

69. Richard Sackler indeed went into the field to promote opioids to doctors alongside a sales representative. When he returned, Richard reportedly argued to Gasdia that a legally required warning about Purdue's opioids was not needed. He asserted that the warning "implies a danger of untoward reactions and hazards that simply aren't there." Richard insisted there should be "less threatening ways to describe Purdue opioids."

70. Plaintiff is informed and believes, and thereupon alleges, that the directors and CEO oversaw Purdue's research, which in some cases contradicted the company's marketing. Company leadership received detailed and specific reports concerning Purdue opioids being used for "opioid-naïve" patients and patients with osteoarthritis.

71. According to documents obtained by the Massachusetts AG, during a 2010 Purdue Board of Directors meeting, the board inquired whether sales representatives could sell more Butrans if they remained silent about failed clinical trials testing Butrans for patients with osteoarthritis: "What can be said in response to a prescriber who asks

20

directly or indirectly, 'can this product be prescribed for my patient with [osteoarthritis]?' In responding are we required to specifically mention the failed trials in [osteoarthritis]?"

72. Plaintiff is informed and believes, and thereupon alleges, that company leadership was directly informed of "Reports of Concern" filed by sales representatives regarding high-prescribing doctors, as well as "field inquiries" in response to the reports.

73. According to documents obtained by the Massachusetts AG, in September 2009, a Purdue sales manager who had concerns about a potential pill mill to which Purdue was promoting opioids sent an e-mail to John Crowley ("Crowley"), Purdue's Executive Director of Controlled Substances Act Compliance: "I feel very certain this is an organized drug ring … Shouldn't the DEA be contacted about this?"   Purdue sat on this information for two years and only reported it to authorities after the pill mill doctor had been arrested and the Sacklers had arranged for lawyers in case Crowley was questioned.

74. Plaintiff is informed and believes, and thereupon alleges, that the directors and CEO monitored sales representatives' e-mails.  Purdue had a policy of prohibiting sales representatives from communicating with doctors via e-mail; when Purdue found that some representatives had in fact e-mailed doctors, the company "investigated" the matter and told the board that the representatives had been disciplined and the matter would be discussed at the next board meeting.

75. Plaintiff is informed and believes, and thereupon alleges, that the directors oversaw Purdue's strategy to pay high-prescribing doctors to promote its opioids.  The board was aware of the amount paid to specific high prescribers and the return on investment it received from these payments.  The board knew that Purdue allowed a gift spending limit of $750 per doctor per year and was told specifically that paying doctors

21

was a high-risk activity that could result in improper off-label use or other promotional activity for opioids.

76.     Plaintiff is informed and believes, and thereupon alleges, that the directors and CEO also managed Purdue's focus on encouraging patients to use higher and higher doses of opioids, leading to health issues, addiction and greater profits for the company.  Upon learning that sales of 40mg and 80mg strengths of OxyContin had fallen below sales targets, the board received multiple reports that public health authority initiatives to have doctors consult with pain specialists before prescribing high opioid doses were a "threat."  The board oversaw measures to counteract against these initiatives and received reports in 2013 that attempts to encourage increased total daily doses had a positive impact on the company's bottom line.

77.     In October 2017, Richard Sackler learned that insurance company Cigna had cut OxyContin from its list of covered drugs and replaced it with a drug from Purdue's competitor, Collegium.   Collegium had agreed to encourage doctors to prescribe lower doses of opioids, and Collegium's contract with Cigna was designed so Collegium would earn less money if doctors prescribed high doses.   Cigna announced that opioid companies influence dosing: "While drug companies don't control prescriptions, they can help influence patient and doctor conversations by educating people about their medications."   According to an e-mail obtained by the Massachusetts AG, Richard Sackler's first thought was revenge: he immediately suggested that Purdue drop Cigna as the insurance provider for the company health plan.

78.     Plaintiff is informed and believes, and thereupon alleges, that the directors additionally oversaw Purdue's plan to keep patients hooked on opioids for longer periods of time through higher doses.  The board received thorough reports of how many patients

remained on Purdue opioids for extended lengths of time, as well as internal documents that indicated patients on higher doses used the product for longer amounts of time, creating greater chances of addiction and abuse. The board was presented with a plan to create workshops and give specific direction to representatives about this link, and that increasing opioid use was a focus point of the company. The board was told in writing that encouraging higher doses "is a focal point of our promotion" and that sales representatives should push doctors to increase patient doses as soon as three days after initial treatment. The board knew or should have known that this sales tactic was both deceptive and placing patients at high risk of addiction and overdose.

79.     In January 2018, Richard Sackler received a patent for a drug to treat opioid addiction for which he had applied in 2007.   He assigned it to a different company controlled by the Sackler family instead of Purdue.   Richard's patent application says opioids are addictive.   The application calls the people who become addicted to opioids "junkies" and asks for a monopoly on a method of treating addiction.

80.     Plaintiff is informed and believes, and thereupon alleges, that the directors also oversaw Purdue's use of "savings cards" to get patients on Purdue opioids for longer periods of time. The board knew exactly how many thousands of cards were used each quarter, the return on investment, and the goal of the program: for patients "to remain on therapy longer."

81.     Plaintiff is informed and believes, and thereupon alleges, that the directors also oversaw Purdue's targeting of prescribers without special knowledge of opioids, as they were the most likely to respond to Purdue's sales techniques. Purdue proceeded with this strategy despite the DEA expressing concern that Purdue was marketing its opioids to doctors who were not appropriately trained in pain management. Purdue's leadership also

23

oversaw a strategy of targeting elderly patients, using images of older patients to target healthcare professionals who practiced in long-term care.  The directors and CEO knew or should have known both that this strategy was deceptive and that targeting doctors who lacked special training in pain management and elderly patients increased the risk of addiction and overdose.

82. Plaintiff is informed and believes, and thereupon alleges, that Purdue's leadership was also aware of a plan to steer patients away from safer pain-management medicines, which involved efforts to emphasize the danger of acetaminophen-based pain medication to the liver.  These efforts included deceptive websites that the New York Attorney General specifically held to be misleading in specific sections.

83. Plaintiff is informed and believes, and thereupon alleges, that Purdue's leadership also oversaw the response to thousands of harm reports from patients, in one case receiving over 5,000 complaints in a single quarter.

84. Plaintiff is informed and believes, and thereupon alleges, that Purdue possesses documents that show each of the reports mentioned above was sent to every individual defendant on the board, including every Sackler Defendant with a board position.

85. These defendants' duplicitous and unlawful acts have damaged, and continue to damage, the Plaintiff in a substantial amount to be determined at trial.  Damages incurred by the Plaintiff include: (a) the costs of treating opioid addiction, including addiction treatment, emergency room visits and inpatient and outpatient treatment; (b) the costs of maintaining harm reduction, overdose prevention and education on the dangers of opioid use; (c) special costs incurred by the Plaintiff for the public safety, health and welfare of its citizens; and (d) the economic harm to the Plaintiff resulting from the opioid addiction epidemic.